UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN DOOLEY, JOHN B. JONES III, DAVID GRATZER, NYLE GRIFFIN, DAN REYES and CAITLIN ANN, LLC,

Plaintiffs,

v.

CRAB BOAT OWNERS ASSOCIATION, FISHERMEN'S MARKETING ASSOCIATION OF BODEGA BAY, HALF MOON BAY FISHERMEN'S MARKETING ASSOCIATION, JOHN MORGAN, MORGAN FISH COMPANY, INC., DUNCAN MACLEAN, TODD WAILEY, JIM SALTER, ROBERT N. MILLER, MICHAEL MCHENRY, DAVID BETTENCOURT, LARRY COLLINS, WILLIAM WISE, JOHN T. TARANTINO, and GEORGE BOOS,

Defendants.

________________________________________/

No. C 02-0676 MHP

**<u>MEMORANDUM & ORDER</u>**
**Cross Motions for Summary Judgment**

The Caitlin Ann fishing company, its managing director John Dooley, and several crew members bring this action against three fishing associations and their members, as well as a purveyor of fish, seeking relief for alleged interference with the Caitlin Ann's Dungeness crab harvesting off the coast of California. Now before the court are defendants' motions for summary judgment and plaintiffs' motion for summary judgment on defendant Half Moon Bay Fishermen's Marketing Association's counterclaims. After having considered the parties' arguments and submissions, and for the reasons set forth below, the court rules as follows.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

BACKGROUND[1]

In its memorandum and order of July 14, 2003, the court set forth the background of this action. For context, the court will repeat some of this background here.

The Caitlin Ann LLC, a Washington limited liability corporation, is the owner of a fishing boat also named the Caitlin Ann. Under the management of John Dooley, the company harvests Dungeness crab off the coast of California, Washington and Oregon. Plaintiffs and defendants agree that crabs are harvested commercially using steel and wire traps, or pots, that rest on the ocean floor. A buoy, attached to each pot, acts as a marker for the fishermen.

The parties agree on little else. According to plaintiffs, the conflict between the parties began when the State of California opened the Northern California Dungeness crab season on December 1, 1999. Plaintiffs contend that two fishermen's marketing associations not named in this action refused to harvest crab, hoping that this refusal would help them negotiate a favorable fixed price with buyers.[2] In a show of solidarity, members of the three defendant associations—the Crab Boat Owners Association ("CBOA"), the Fishermen's Marketing Association Incorporated of Bodega Bay ("FMABB"), and the Half Moon Bay Fishermen's Marketing Association ("HMBFMA")—also allegedly refused to fish in order to set a price more favorable to the fishermen.

Plaintiffs, however, did not join this "tie up."[3] Instead, Dooley prearranged to sell his catch to Three Captains, a local buyer in Half Moon Bay. Maclean, the President of the HMBFMA, came to the Three Captains facility and told the owners, Larry and Mary Fortado, that the HMBFMA would "blackball"[4] their company if they purchased Dooley's crab. When the Caitlin Ann boat returned to port, a group of angry HMBFMA members, including Maclean, confronted the crew and yelled obscenities. Dooley later discovered the word "scab" spray painted on the side of the vessel. During the next crab season, members of the associations refused to sell their crab to Three Captains. Three Captains suffered financial harm as a result of being "blackballed," and it refused to buy crab from Dooley during the 2000 crab season.

When the Southern California Dungeness crab season opened on November 15, 2001, plaintiffs claim that the three defendant associations and their members once again refused to fish so as to fix a

UNITED STATES DISTRICT COURT
For the Northern District of California

favorable price for crab. The Caitlin Ann company had already contracted with a buyer, Exclusive Fresh. On November 16, 2001, plaintiffs allege that association members told Dooley that there would be "trouble" and "heavy repercussions" if he harvested crab during the tie-up, and a group of members, including Maclean and Salter, came to the dock and threatened the Caitlin Ann's crew.

Despite these threats, the Caitlin Ann departed on November 16, 2001, and set approximately 930 crab pots. The following day, the crew of the Caitlin Ann returned to the area where they had set the pots and found approximately 647 crab pot lines cut. Plaintiffs allege that defendant Todd Whaley[5] was involved in cutting the lines. Plaintiffs spotted a Crescent City style boat near plaintiffs' gear. Whaley's boat, the Dynamik, is a Crescent City style boat. Whaley does not dispute that his boat was near the lines. Rather, he claims that on the evening of November 17, 2001, he went out to pull plaintiffs' buoys to see if they were catching crab and that when he arrived the lines had already been cut. Prior to returning to Half Moon Bay, Dave Bracciotti, a fisherman, had warned John Dooley's brother, Robert Dooley, that someone intended to cut their crab pot lines.[6]

Defendants also allegedly interfered with plaintiffs' ability to deliver crab to Exclusive Fresh. Prior to Caitlin Ann's return to port, Dooley contacted Phil Bruno, the owner of Exclusive Fresh. Bruno informed Dooley that Michael McHenry had contacted him and urged him not to purchase Dooley's crab. Bruno also informed Dooley that he would be unable to purchase the crab because the transient dock at Half Moon Bay was blocked by another vessel owned by defendant Duncan Maclean. Dooley had previously made plans with the harbor master to use the transient dock, the only space that could accommodate a vessel the size of the Caitlin Ann. Plaintiffs contend that Maclean, encouraged by the associations, deliberately blocked the Caitlin Ann from docking in order to punish plaintiffs for harvesting crab during the strike. Maclean argues that he tied up at the transient dock to undertake maintenance of his vessel.[7]

Unable to access Half Moon Bay, plaintiffs sailed to San Francisco, where they had identified a new buyer for their crab, J&S Quality Seafood ("J&S"). Prior to plaintiffs' arrival, members of the associations allegedly threatened Jim Schach, the owner of J&S, with "blackballing" if he purchased Dooley's crab. John Morgan, the owner of Morgan Fish Company, Inc., a large purveyor of Dungeness

crab, also contacted Schach, warning him not to buy Dooley's crab. One of Morgan's employees contacted Shach to convey a similar message. Following J&S' purchase of plaintiffs' crab, Morgan contacted customers of J&S to dissuade them from purchasing crab from J&S and allegedly told them they would be boycotted if they purchased the crab. Morgan, a distributor of Polar Ice, a company owned by John Tarantino, also refused to sell ice to J&S.[8]

On February 7, 2002, plaintiffs filed a complaint against three defendant fishermen associations located in the greater San Francisco Bay Area, the CBOA, FMABB, and HMBFMA; individual members of the associations, Duncan Maclean, Jim Salter, Robert N. Miller, Michael McHenry, Larry Collins, William Wise, John T. Tarantino and George Boos; and other individuals that allegedly cooperated with the associations, John Morgan, Morgan Fish Company, Inc.,[9] Todd Whaley and David Bettencourt. In large measure, plaintiffs accuse defendants of violating sections 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), sections 1 and 2 of the Sherman Act, and sections 16750 and 17200 of the California Business and Professions Code. 18 U.S.C. §§ 1962(c), (d); 15 U.S.C. § § 1, 2; Cal. Bus. & Prof. Code §§ 16750, 17200. Plaintiffs also allege that defendants unlawfully interfered with contractual relations and with prospective economic advantage, and adding conversion and trespass to chattels claims as well. In turn, defendant HMBFMA brings three counterclaims against Caitlin Ann LLC and Dooley (collectively "counterdefendants"). HMBFMA alleges that counterdefendants sold crab below cost from 1999 to the present, used a boat that had a trawling net in violation of state permitting requirements, and, in 1999, fished in a wasteful and destructive manner. HMBFMA also alleges that counterdefendants threatened HMBFMA members and other fishermen with damage to their fishing gear, and did in fact damage gear by trawling through fishing areas already set with pots. Through this conduct, HMBFMA alleges that counterdefendants violated sections 17200 and 17043 of the California Business and Profession Code, and engaged in tortious interference with prospective economic advantage.

On March 31, 2003, countedefendants filed a motion for summary judgment. On July 14, 2003, following a hearing on that motion, this court issued a memorandum and order finding that HMBMFA had not produced any evidence demonstrating that counterdefendants had (1) engaged in predatory pricing, (2) procured and renewed a permit for Dungeness crab with a vessel that was equipped with a trawling net, or

UNITED STATES DISTRICT COURT
For the Northern District of California

(3) dragged a trawling net over fishing areas in order to deter HMBFMA members from placing their crab pots there. Accordingly, the court ordered HMBMFA to submit declarations explaining the reasonable basis for its claims. HMBFMA subsequently filed two declarations with the court. On August 12, 2003, the court granted HMBFMA's motion to dismiss its third counterclaim for tortious interference with prospective economic advantage. Now before the court are defendants' motions for summary judgment as to all of plaintiffs' claims and plaintiffs' motion for summary judgment as to HMBFMA's counterclaims.

LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The moving party for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. Id.; see also Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 959–60 (9th Cir. 1994). Nor is it sufficient for the opposing party simply to raise issues as to the credibility of the moving party's evidence. National Union Fire Ins. Co. v. Argonaut Ins. Co., 701 F.2d 95, 97 (9th Cir. 1983). If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is 'entitled to judgment as a matter of law.'" Celotex Corp., 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

UNITED STATES DISTRICT COURT
For the Northern District of California

DISCUSSION

I. Plaintiffs' Claims

A. RICO Section 1962(c)

Plaintiffs seek treble damages under the civil provisions of RICO for acts of extortion prohibited by the Hobbs Act. Specifically, plaintiffs contend that defendants violated RICO section 1962(c). Section 1962(c) prohibits persons whose actions affect interstate commerce from using an enterprise to engage in a "pattern of racketeering activity."[10] 18 U.S.C. § 1962(c). To prove a violation of section 1962(c), plaintiffs must demonstrate that defendants engaged in conduct of an enterprise through a pattern of racketeering activity. Salinas v. United States, 522 U.S. 52, 62 (1997).

1. Defendants' Enterprise

Defendants contend that plaintiffs' RICO claim fails because plaintiffs have not put forward sufficient evidence to demonstrate the existence of an enterprise. Establishing the existence of an enterprise requires proof of an ongoing organization, formal or informal, with various associates functioning as a continuing unit. Chang v. Chen, 80 F.3d 1293, 1299 (9th Cir. 1996). An enterprise may include both legitimate and illegitimate entities, but it must exist separate and apart from the pattern of racketeering activity in which it engages. United States v. Turkette, 452 U.S. 576, 580-81, 583 (1981). At a minimum the entity:

> must exhibit some sort of structure . . . for the making of decisions, whether it be hierarchical or consensual. The structure should provide some mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis. The structure requirement, however, does not mean that every decision must be made by the same person, or that authority may not be delegated.

Chang, 80 F.3d at 1299 (citations and internal quotation marks omitted). In order to participate in the conduct of the enterprise, one must have participated in the "operation or management" of the enterprise. Reves v. Ernst & Young, 507 U.S. 170, 180 (1993). "The function of overseeing and coordinating the commission of several different predicate offenses and *other activities* on an on-going basis is adequate to satisfy the separate existence requirement." Chang, 80 F.3d at 1298. Furthermore, a plaintiff may name members of an association-in-fact enterprise as individual defendants. River City Markets, Inc. v. Fleming Foods West, Inc., 960 F.2d 1458, 1462 (9th Cir.1992).

Plaintiffs allege that defendants participated in an enterprise separate and apart from the pattern of racketeering activity. The three associations cooperated at the beginning of the crab season to determine an appropriate "ex-vessel" price for crab.[11] The associations abided by the decisions of each other as to the agreed upon price and voted by majority vote. Salter Dep. at 63, 117. Jim Salter stated in his deposition that, in 2001, the entire fleet of commercial crab fishermen in fishing in the Gulf of the Farollones agreed not to fish because two of the three associations were unwilling to accept a market price of $2.00 per pound. Salter Dep. at 117. John Tarantino regularly contacted association representatives and served as a central clearinghouse for information among the fishermen. McHenry Dep. at 142; Whaley Dep. at 57. Phone records also indicate that the associations and individual defendants contacted each other prior to the opening of the season. Sheer Decl., Exh. S. A reasonable factfinder could conclude that the three associations constitute an enterprise because they operate as an informal organization, separate and distinct from the alleged racketeering activity at issue in this case. Because Maclean, Salter, Wise, Miller, Collins, and Boos were all members of and served in executive positions in the associations, a reasonable factfinder could determine that they participated in the operation of the enterprise.

Plaintiffs have also demonstrated that there exists a genuine question of material fact as to whether John Morgan and the Morgan Fish Company, Inc. participated in the enterprise. Morgan and the Morgan Fish Company, Inc. cooperated in the operation of an ice plant owned by Tarantino. Morgan abided by the associations' decision not to fish or sell crab at the start of the season by not purchasing crab and by picketing in front of J&S following their purchase of Dooley's crab. The Morgan Fish Company, Inc. also assessed a three-cent tax on each pound of Dungeness crab against the fisherman and remitted this tax to the association. As a result, a reasonable factfinder could conclude that Morgan and the Morgan Fish Company, Inc. participated in the operation of the enterprise.

Finally, plaintiffs have demonstrated a genuine issue of material fact as to whether Whaley, McHenry and Bettencourt participated in the enterprise. Defendants' primary argument is that these individuals were not members of any association and thus could not have participated in the operation or management of the enterprise. As the Supreme Court noted in Reves, "[a]n enterprise is operated not just by upper management but also by lower rung participants in the enterprise who are under the direction of

upper management." Reves, 507 U.S. at 178-79, 184 (internal quotation marks omitted). Moreover, on a motion for summary judgment, the court must construe the evidence in a light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Defendant Whaley abided by the price schedule set by the associations and participated in the 2001 tie-up. While McHenry was not a member of an association, he also abided by the price schedule set by the associations and contacted Tarantino to determine whether he could fish based on the associations' decision as to the set price. In addition, Bettencourt allegedly refused to sell crab to Three Captains following their purchase from Dooley during the 1999 tie-up. Based on these facts, a reasonable factfinder could conclude that an enterprise existed between the associations, Whaley, McHenry and Bettencourt.

2. Pattern of Racketeering Activity

In order to satisfy the requirement under RICO that a defendant have engaged in a pattern of racketeering activity, each defendant must have committed at least two predicate acts within ten years. 18 U.S.C. § 1961(5); Banks v. Wolks, 918 F.2d 418, 421 (3d Cir. 1990); see also Volmar Dist. Inc. v. New York Post Co., Inc., 825 F. Supp. 1153, 1166 (S.D.N.Y. 1993); Pelfresne v. Village of Rosemont, 22 F. Supp. 2d 756, 764 (N.D. Ill. 1998). An indictable offense under the Hobbs Act is considered "racketeering activity," 18 U.S.C. § 1961(1)(B), and two or more such offenses within ten years may constitute a "pattern," 18 U.S.C. § 1961(5). In relevant part, the Hobbs Act prohibits extortion, or an attempt or conspiracy to commit extortion, that in any manner affects interstate commerce. 18 U.S.C. § 1951(a).[12] The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Threats or acts of physical violence "in furtherance of a plan or purpose to do anything in violation of this section" are also prohibited. 18 U.S.C. § 1951(a). Under the Hobbs Act, the term "property" includes "[t]he right to make business decisions free from wrongful coercion." United States v. Zemek, 634 F.2d 1159, 1174 (9th Cir. 1980). Because the Hobbs Act prohibits not only extortion, but also attempt or conspiracy to commit extortion, an attempt or conspiracy to commit extortion constitutes an indictable offense under RICO. See 18 U.S.C. § 1951(a); 18 U.S.C. § 1961(1)(B). Thus, attempting or conspiring to commit extortion "through the use of actual or threatened force, violence, or

fear" may be considered a predicate act for purposes of RICO. See 18 U.S.C. § 1951(a); 18 U.S.C. §§ 1961(1)(B), (5); see also United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc., 793 F. Supp 1114, 1133 (E.D.N.Y. 1992).

Defendants argue that no defendant committed two predicate acts, and so no defendant engaged in a pattern of racketeering activity. A genuine issue of material fact exists as to whether defendants Morgan and Maclean committed two predicate acts. This court determined in its prior order that the following acts could function as the necessary predicate acts:

> Defendants Maclean and Michael McHenry, as well as other members of the associations, threatened Exclusive Fresh with loss of business so that the company reneged on its promise to purchase crab from plaintiffs;
>
> Defendant Morgan and other members of the associations threatened J&S Quality Seafood with loss of business if the company purchased crab from plaintiffs;
>
> Defendant Morgan and his company, Morgan Fish, threatened buyers and customers of J&S Quality Seafood with loss of business if they purchased "scab crab" from the company;
>
> Defendants Maclean, Jim Salter and other members of the associations threatened the crew of the Caitlin Ann with harm if they went fishing;
>
> Defendant William Wise and FMABB threatened Bodega Bay Fish with loss of business if the company provided bait to another fisherman, Richard Axelson, who planned to go fishing during the strike in November 2001; and
>
> Defendant Whaley as well as members of the associations conspired to and were involved in cutting the lines to the Caitlin Ann's crab pots.

July 14, 2003, Order at 9. With the exception of the allegations in regard to Wise, plaintiffs have put forward sufficient evidence, through the depositions of Dooley, Shach, Axelson, Whaley, and others, to raise a genuine issue of material fact as to whether these acts occurred. Whether defendants engaged in these acts to further a scheme of extortion is a question of fact, resolution of which depends upon the intent of the individuals involved. If these acts did in fact occur, and if the defendants did participate in these acts to further a scheme of extortion, a reasonable factfinder could determine that defendants Morgan and Maclean engaged in a pattern of racketeering activity in violation of section 1962(c).[13]

A genuine issue of material fact also exists as to whether the defendant associations committed two predicate acts. Plaintiffs have presented evidence that the defendant associations attempted to commit extortion in violation of the Hobbs Act. See 18 U.S.C. § 1951(a). In particular, in 1999, members of the

associations allegedly threatened Three Captains, telling Three Captains that it would be "blackballed" if it purchased Dooley's crab. L. Fortado Decl. ¶ 5. During the 2001 tie-up, association members threatened Dooley with "trouble" and "heavy repercussions" if Dooley harvested crab. Dooley Decl. ¶ 15. Tarantino, who allegedly served as a central contact person between the associations, refused to sell ice to J&S through his company, Polar Ice, following J&S' purchase of Dooley's crab during the 2001 tie-up. Schach Decl. ¶ 11. These actions were not limited to Dooley, but also extended to other fishermen who attempted to harvest crab during tie-ups. See Axelson Decl. ¶ 7. Based on this evidence, a reasonable juror could conclude that the defendant associations engaged in repeated attempts to keep Dooley from selling crab in District 10 during tie-ups. See Zemek, 634 F.2d at 1174. Individual members of the associations, who were also fishermen, stood to gain financially from Dooley's exclusion from the local market. While they were not ultimately successful in keeping Dooley out of the market, a genuine issue of material fact exists as to whether, through their actions, the associations violated the Hobbs Act. See 18 U.S.C. § 1951(a). As this court noted in its prior order, "That defendants in fact failed to halt the Caitlin Ann's operations does not affect the analysis, since the Hobbs Act reaches both actual extortion and attempts or conspiracies to commit extortion." July 14, 2003, Order at 8-9. A reasonable juror could conclude that the defendant associations engaged in multiple attempts to extort plaintiffs in violation of the Hobbs Act. See 18 U.S.C. § 1951(a). Because each of these attempts is an indictable offense under the Hobbs Act, each constitutes a predicate act for purposes of RICO. See 18 U.S.C. § 1961(1)(B). Plaintiffs have therefore demonstrated a genuine issue of material fact as to whether the defendant associations engaged in a pattern of racketeering activity. See 18 U.S.C. § 1962(c).

A genuine issue of material fact also exists as to whether John Tarantino committed two predicate acts. Tarantino allegedly attempted and conspired to commit extortion in violation of the Hobbs Act. See 18 U.S.C. § 1951(a). Tarantino's direct connection with the associations, and his service as a central contact person between the associations, indicates that he conspired to extort defendants in violation of the Hobbs Act. See McHenry Dep. at 142; Whaley Dep. at 57. In addition, Tarantino refused to sell ice to J&S through his company, Polar Ice, in connection with Morgan and Morgan Fish Co., following J&S' purchase of Dooley's crab. See Schach Decl. ¶ 11. A reasonable juror could conclude that Tarantino's



UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

refusal to sell ice to J&S constitutes an attempt to commit extortion in violation of the Hobbs Act. Because both acts are considered indictable offenses under the Hobbs Act, a genuine issue of material fact exists as to whether Tarantino committed two predicate acts for purposes of RICO. See 18 U.S.C. § 1962(c). While plaintiffs have properly demonstrated that Morgan, Morgan Fish Co., Maclean, the defendant associations and Tarantino committed two predicate acts, they have not presented sufficient evidence to demonstrate that any other defendant engaged in two predicate acts for purposes of RICO.[14] See 18 U.S.C. § 1961(5).

Defendants also argue that plaintiffs' alleged pattern of racketeering lacks continuity. In order to establish a pattern of racketeering activity, a plaintiff must also demonstrate a "relationship" between the predicate acts and a "threat of continuing activity." H.J. Inc., v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989). A plaintiff may establish a threat of continuing activity "if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit," even if the number of related predicate acts is small and if they occur close together in time. Id. at 242. In this case, defendants allegedly engaged in "tie-ups" and threatened crab purchasers not only during the 2001 season, but also in previous years. Further, defendants did not confine these threats to plaintiffs. They allegedly threatened to "blackball" Three Captains during the 1999 season and later threatened Richard Axelson and J&S for engaging in crab sales during the November 2001 "tie-up." The threat of long-term, continuous racketeering activity against Dooley, J&S, Schach, Axelson, and others is at least implicit in defendants' acts. Construing this evidence in a light most favorable to the nonmoving party, the court concludes that plaintiffs' RICO claim does not fail for lack of continuity.

3. Standing

Defendants argue that plaintiffs' only recoverable damages are the loss of plaintiffs' crab pots and gear, and that plaintiffs have failed to demonstrate that the associations or any of the individual defendants were involved in the cutting of plaintiffs' crab pot lines. As a result, defendants allege that plaintiffs do not have standing to bring a RICO claim because they cannot show that defendants injured their business or property. In order to sue for a violation of RICO, a plaintiff must have been injured "in his business or property" by reason of the RICO violation. 18 U.S.C. 1964(c). Whaley allegedly damaged plaintiffs' crab

UNITED STATES DISTRICT COURT
For the Northern District of California

gear. Plaintiffs suffered financial losses for the season due to the cost of replacing that gear and the inability to fish until they were able to replace it. Defendants' threats to crab purchasers and to customers of crab purchasers may have resulted in financial loss to plaintiffs' business as well. As a result of these alleged acts, plaintiffs suffered financial losses. These financial losses demonstrate injury to plaintiffs' business and property sufficient to survive a motion for summary judgment

B. RICO Conspiracy Under Section 1962(d)

Plaintiffs also allege that defendants conspired to violate section 1962(c), which is itself a violation of RICO section 1962(d). 18 U.S.C. § 1962(d). Under section 1962(d), "a conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." Salinas, 522 U.S. 52, 65 (1997). For purposes of conspiracy liability, a plaintiff is not required to show that each defendant agreed to commit two predicate acts. Id.; United States v. Frega, 179 F.3d 793, 810 n.21 (9th Cir. 1999). Rather, the defendant "must have been aware of the essential nature and scope of the criminal enterprise and intended to participate in it." Howard v. America Online Inc., 208 F.3d 741, 751 (9th Cir. 2000) (citing Baumer v. Pachl, 8 F.3d 1341, 1346 (9th Cir. 1993)) (internal quotation marks omitted).

As stated above, plaintiffs have sufficiently demonstrated, for purposes of a motion for summary judgment, that defendants were involved in an enterprise which engaged in a pattern of racketeering activity. Plaintiffs have put forward evidence that several of the defendants participated in the enterprise and engaged in acts to further the purpose of the enterprise. These acts include the aforementioned predicate acts, as well as the following overt acts:

Defendant Maclean threatened Larry and Mary Fortado that Three Captains would be blackballed if they purchased scab crab;

Defendant Bettencourt and others refused to sell to Three Captains after they purchased crab from Dooley;

Defendant Whaley as well as members of the associations allegedly conspired to and were involved in cutting the lines to the Caitlin Ann's crab pots;

Tarantino served as a central contact person between the associations and, in connection with Morgan, refused to sell ice to J&S following Dooley's sale of crab to J&S; and

Defendant Maclean blocked the transient dock in order to prevent Dooley from docking in Half Moon Bay to deliver crab to Exclusive Fresh.

Plaintiffs have put forward sufficient evidence, through the declarations of Larry and Mary Fortado, Schach and Dooley, as well as the depositions of Whaley, McHenry and others, to raise a genuine issue of material fact as to whether these acts occurred. Based on the aforementioned predicate acts and these overt acts, a reasonable factfinder could conclude that the associations, Morgan, Morgan Fish Company, Inc., Maclean, Whaley, Salter, McHenry, Bettencourt, and Tarantino conspired to further an endeavor to prevent plaintiffs and other individuals who did not participate in the "tie-up" from engaging in the crab business within the greater San Francisco Bay Area. In contrast, plaintiffs have not raised a genuine issue of material fact with respect to the conspiracy claim in regard to defendants Miller, Collins, Wise and Boos because they have not put forward evidence demonstrating that these defendants intended to further the conspiracy.

C. Claim for Violation of Section 2 of the Sherman Act

The associations, joined by Whaley, also contend that this court should grant summary judgment in their favor with regard to plaintiffs' claim that defendants violated section 2 of the Sherman Act. Section 2 of the Sherman Act prohibits monopolization, attempts to monopolize, and conspiracies to monopolize any part of trade or commerce in a particular state. 15 U.S.C. § 2.[15] In order to succeed on a claim of actual monopolization, a plaintiff must demonstrate that the defendant willfully acquired or maintained monopoly power in the relevant market through anticompetitive conduct. Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko LLP, __ U.S. __, 124 S. Ct. 872, 878-79 (2004) (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)); American Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publications, Inc., 108 F.3d 1147, 1151 (9th Cir. 1997). In order to succeed on a claim of attempted monopolization, a plaintiff must demonstrate that the defendant engaged in anticompetitive conduct with a specific intent to monopolize and had a dangerous probability of achieving monopoly power. Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993); see also Thurman Indus., Inc. v. Pay'N Pak Stores, Inc., 875 F.2d 1369, 1378 (9th Cir. 1989). Under either claim, a plaintiff must demonstrate that the anticompetitive conduct caused antitrust injury. Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1433 (9th Cir. 1995).

1. Relevant Market

Under either a claim for monopolization or a claim for attempted monopolization, a plaintiff must set forth both the relevant product and geographic markets that defendants have endeavored to monopolize. Spectrum Sports, Inc., 506 U.S. at 459. The relevant product market includes "the pool of goods or services that enjoy a reasonable interchangeability and a cross-elasticity of demand." Morgan, Strand, Wheeler & Biggs, 924 F.2d 1484, 1489 (9th Cir. 1991). The relevant geographic market is defined by "the area of effective competition where buyers can turn for alternate sources of supply." Id. at 1490. The definition of the relevant market—both product and geographic—is generally a question of fact reserved for the jury. High Tech. Careers v. San Jose Mercury News, 996 F.2d 987, 990 (9th Cir. 1993); see also Oahu Gas Serv., Inc. v. Pac. Resources Inc., 838 F.2d 360, 363 (9th Cir. 1988) ("Our previous decisions establish that both market definition and market power are essentially questions of fact.").

Plaintiffs contend that the product market is limited to crab caught in the San Francisco Bay Area between November 15th and December 1st. Plaintiffs have presented evidence demonstrating that crab caught in the San Francisco Bay Area is fuller, firmer, and more flavorful than crab caught in other areas, and that fresh crab is not reasonably interchangeable with frozen crab. Caito Decl., ¶ 3; Dooley Decl., ¶ 11. While plaintiffs have alleged that demand for fresh crab peaks between November 15th and December 1st, they have failed to present any evidence that crab caught during this period differs from crab caught later in the season. Based on this evidence, a reasonable factfinder could not determine that the relevant product market was limited to crab caught between November 15th and December 1st, but could conclude that relevant product market is fresh crab caught in the San Francisco Bay Area.

Plaintiffs contend that the relevant geographic market is limited to the greater San Francisco Bay Area, which includes San Francisco Bay, Half Moon Bay, and Bodega Bay. Defendants argue that consumers can turn to other sources of supply for crab, including the Crescent City/Eureka area, Oregon and Washington. The crab season in these northern areas does not open until December 1st. Therefore, crab caught in the North does not compete with local San Francisco crab caught during the November 15th to December 1st time period. Defendants also argue that certain Native American tribes compete with San Francisco Bay Area crab fishermen for sales by fishing in the North prior to November 15th and

UNITED STATES DISTRICT COURT
For the Northern District of California

shipping the crab by truck to San Francisco. In contrast, plaintiffs have presented evidence that crab caught in the San Francisco Bay Area is superior to crab caught in other areas, and that customers prefer and will pay more for crab caught in the San Francisco Bay Area. Dooley Decl. ¶ 11. In addition, the industry segregates and markets crab caught in the San Francisco Bay Area as a branded product. Caito Decl. ¶ 4. Based on this evidence, plaintiffs have demonstrated a genuine issue of material fact as to whether the relevant geographic market is limited to crab caught in the San Francisco Bay, Half Moon Bay, and Bodega Bay areas.

2. Monopoly Power

Plaintiffs must also show that the defendant has monopoly power within the relevant market. 15 U.S.C. § 2. The question of whether monopoly power exists depends heavily upon market share and barriers to entry. Oahu Gas Serv., Inc., 838 F.2d at 366; see also Rebel Oil, 51 F.3d at 1437. A lesser showing of market power is required in an attempt case than in an actual monopolization case.[16] Rebel Oil, 51 F.3d at 1438. Entry barriers are "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." Id. at 1439. In order to demonstrate sufficient barriers to entry, "[t]he plaintiff must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price." Id.

Plaintiffs have demonstrated that a genuine issue of material fact exists with regard to defendants' monopoly power. Plaintiffs have presented evidence that association members owned and operated 289 of approximately 300 vessels in the District 10 fleet. Dooley Decl. at ¶ 7; Sheer Decl., Exhs. Q, U, V, W, and X. This amounts to a 96% market share, and it is well within the range that would allow defendants to exercise actual monopoly power over the local San Francisco fresh crab market. In addition, plaintiffs have put forward sufficient evidence to create a genuine issue of material fact as to barriers to entry. Plaintiffs have presented evidence that defendants prevented non-local fishermen, including Dooley, from selling crab to local buyers during the tie-ups. Bruno Decl. at ¶ 7; Dooley Decl. at ¶ 12. They have also presented evidence that defendants encouraged local buyers not to purchase crab from fishermen during the tie-ups. Bruno Decl. at ¶ 6; L. Fortado Decl. at ¶ 5; Scach Decl. at ¶ 6. Based on the evidence of defendants'

market share and barriers to entry, a reasonable factfinder could determine that defendants have acquired monopoly power within the relevant market.

3. Anticompetitive Conduct

A violation of the Sherman Act also requires a showing of anticompetitive conduct. Verizon Communications, 124 S. Ct. at 879. While competition among rivals does not violate the Sherman Act, a reduction of competition which harms consumer welfare does contravene the Act. Rebel Oil, 51 F.3d at 1433 ("An act is deemed anticompetitive under the Sherman Act only when it harms both allocative efficiency *and* raises the prices of goods above competitive levels or diminishes their quality."). Thus, a plaintiff must demonstrate a "significant and more-than-temporary harmful effect on competition," not just on a competitor or consumer. American Prof'l Testing, 108 F.3d 1151; see also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 225 (9th Cir. 1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'"); Oahu Gas Serv., 838 F.2d at 370 ("The goal of antitrust laws, however, unlike that of business tort or unfair competition laws, is to safeguard general competitive conditions, rather than to protect specific competitors."). Therefore, it is necessary to consider defendants' conduct not only as it relates to plaintiffs, but also as it impacts consumers and competition overall. Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 (1985). A company engages in predatory behavior when it attempts to "exclude rivals on some basis other than efficiency." Id. Thus, exclusionary conduct includes behavior that not only tends to impair the opportunities of rivals, but also fails to further competition or furthers competition in an unnecessarily restrictive manner. Id. at 605 n.32 (citations omitted).

Plaintiffs have demonstrated a genuine issue of material fact as to whether defendants' alleged conduct is anticompetitive and may have a long-term harmful effect on competition. Defendants engaged in tie-ups that restrained the sale of crab. They also allegedly organized and participated in boycotts of

UNITED STATES DISTRICT COURT
For the Northern District of California

consumers who purchased crab from fishermen not participating in the tie-ups, including Three Captains and J&S. See L. Fortado Decl. at ¶¶ 5, 7; Schach Decl. at ¶ 12. Furthermore, defendants allegedly threatened fishermen and purchasers and committed tortious acts, including cutting Dooley's crab pot lines. See Schach Decl. at ¶ 6; L. Fortado Decl. at ¶ 5; Dooley Decl. at ¶¶ 16, 21. These allegations, if true, would have harmed competition by preventing crab from reaching market at a competitive price, by intentionally harming those consumers that purchased crab during the tie-ups, and by attempting to keep northern fishermen who only fished for crab in the relevant market between November 15th and December 1st from competing with local fishermen. Plaintiffs have thus raised a genuine issue of material fact as to whether defendants intended to acquire monopoly power.

4. Antitrust Injury

In order to recover under the Sherman Act, a plaintiff must demonstrate antitrust injury. Rebel Oil, 51 F.3d at 1433; Gray v. Shell Oil Co., 469 F.2d 742, 748-49 (9th Cir. 1972). To prove antitrust injury, plaintiffs must prove that their loss flowed from the defendants' anticompetitive conduct. Rebel Oil, 51 F.3d at 1433. The conduct that causes the injury must also adversely affect competition. Id. Plaintiffs have demonstrated sufficient evidence of antitrust injury. In particular, plaintiffs have proffered evidence that they incurred approximately $218,000 in damages as a result of the losses associated with the cutting of their crab pot lines. Sheer Decl., Exh. Y. Defendants' anticompetitive conduct also caused their injury. Plaintiffs have presented evidence that defendants intended to exclude non-local fishermen from fishing in District 10 and engaged in the tie-ups in order to keep these fishermen out of the relevant market. Dooley Decl. at ¶ 21; Whaley Dep. at 47; Cannia Dep. at 33. Based on this evidence, a reasonable factfinder could conclude that defendants cut plaintiffs crab pot lines in order to exclude Dooley from competing with defendants. Such conduct adversely affects competition by limiting the crab available to consumers and thus driving up the price of crab.

5. Standing

While neither Caitlin Ann's crewmembers nor Dooley, as an individual, have standing to bring an antitrust action against defendants, Caitlin Ann LLC does have standing. In order to maintain an antitrust action, the injured party must be a participant in the same market as the defendants. Eagle v. Star-Kist

Foods, Inc., 812 F.2d 538, 540 (9th Cir. 1987). While sellers of the crab are considered part of the same market as defendants, individual crewmembers of fishing vessels are not. See id. The crewmembers lack standing to bring an antitrust action.

Dooley also lacks standing to sue in his capacity as an individual or as a shareholder of Caitlin Ann LLC. "A shareholder of a corporation injured by an antitrust violation does not have standing to sue." Vinci v. Waste Management, Inc., 80 F.3d 1372, 1375 (9th Cir. 1996). "This rule applies even if the injured shareholder is the sole shareholder or if the shareholder alleges that the antitrust violations were intended to drive the individual out of the industry." Id. (citations omitted).

D. Claim for Violation of Section 1 of the Sherman Act

Section 1 of the Sherman Act prohibits parties from entering into agreements and conspiracies that unreasonably restrain trade. 15 U.S.C. § 1; Copperweld Corp. v. Independent Tube Corp., 467 U.S. 752, 767-68 (1984). Courts analyze agreements or conspiracies to restrain trade under either the "per se rule" or the "rule of reason." Thurman Indus., 875 F.2d at 1373. Courts evaluate concerted activity under section 1 more rigorously than under section 2, and may hold that certain agreements are so inherently anticompetitive that they are illegal per se without further inquiry into the harm they have actually caused. Cooperweld Corp., 467 U.S. at 768.

Plaintiffs have raised a genuine issue of material fact as to whether defendants' conduct is per se illegal under section 1 of the Sherman Act because defendants fixed prices and attempted to exclude competing fishermen from the market.[17] Local 36 of Int'l Fishermen & Allied Workers of America v. United States, 177 F.2d 320 (9th Cir 1949), presents a set of facts highly analogous to the present situation. In that case, a fishermen's cooperative conspired to fix and maintain noncompetitive prices for fresh fish and to exclude non-cooperative members from the market. Id. at 327. The cooperative used coercive means to accomplish these objectives, including the use of picketing, boycotting and unconcealed threats of violence and pressure. Id. at 328. The Ninth Circuit held that "where a complaint charges that defendants have engaged in price fishing, or have concertedly refused to deal with nonmembers of an association . . . the amount of commerce involved is immaterial because such restraints are per se illegal."

Id. at 331. The court concluded not only that the conspiracy to fix prices constituted a per se violation of section 1, but also that the exclusion of other fishermen from the market violated the statute. Id. at 331.[18]

Like the fishermen's cooperative in Local 36, the CBOA, FMABB and HMBFMA combined and voted to fix the price of crab. They also allegedly engaged in "tie-ups" designed to increase the price of crab in the market, and used both unconcealed threats and violence to exclude plaintiffs from the market. In particular, defendants allegedly threatened plaintiffs and their customers, and cut plaintiffs crab pot lines. A reasonable jury could find that these acts constitute per se violations of section 1 of the Sherman Act because they deprive consumers of fair prices for crab and adversely affect competition within the fresh crab market.[19]

E. State Antitrust Claims

Defendants claim that plaintiffs' state antitrust law claim under section 16750 of the California Business and Professions Code (the "Cartwright Act") fails for the same reasons the federal antitrust claim fails. "The Cartwright Act is patterned after the Sherman Act, and 'federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act.'" Nova Designs, Inc. v. Scuba Retailers Ass'n, 202 F.3d 1088, 1092 (9th Cir. 2000) (citing Marin County Bd. of Realtors v. Palsson, 16 Cal. 3d 920 (1976)). Neither party contends that the analysis under state antitrust law differs from the analysis under the Sherman Act. Thus, defendants' motion for summary judgment in regard to plaintiffs' section 16750 claim fails for the same reasons stated by the court in sections I(C) and I(D).

F. California Business and Professions Code Section 17200 Claim

Defendants claim that plaintiffs have not presented any evidence indicating that they engaged in "unfair, unlawful or fraudulent" business practices in violation of section 17200 of the California Business and Professions Code. "Section 17200 borrows violations from other laws by making them independently actionable as unfair competitive practices." Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1143 (2003) (citing Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163, 180 (1999)). An action may also be deemed unfair even if it does not amount to a violation of some other law. Id. Defendants argue that plaintiffs' section 17200 claim fails because plaintiffs have not presented sufficient evidence to support either its RICO or federal antitrust claims or otherwise



UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

demonstrated that defendants engaged in unfair business practices. They also argue that the damages requested by plaintiffs are not recoverable under section 17200. Plaintiffs claim a total of $218,292 in compensatory damages as a result of not being able to fish due to the cutting of their crab pot lines. Under California's Unfair Competition Laws, damages are limited to restitution. Id. at 1144. Thus, even if plaintiffs could demonstrate a genuine issue of material fact as to defendants' violation of section 17200, their request for compensatory relief would not be recoverable. The court therefore grants defendants motion for summary judgment as to plaintiffs section 17200 claim.

G. State Tort Claims

Plaintiffs bring four state tort claims: (1) intentional interference with contractual relations; (2) intentional interference with prospective economic advantage; (3) conversion; and (4) trespass to chattels. The court will address each in turn.

1. Intentional Interference With Contractual Relations

Plaintiffs claim that defendants unlawfully and intentionally interfered with their contract with Exclusive Fresh. Intentional interference with contractual relations requires that the plaintiff demonstrate (1) a valid contract between the plaintiff and a third party; (2) defendants knowledge of the contract; (3) intentional acts designed to induce breach or disrupt the contractual relationship; (4) actual breach or disruption of the relationship; and (5) resulting damage. Pacific Gas and Electric Co. v. Bear Stearns & Co., 50 Cal. 3d 1118, 1126 (1990). While plaintiffs have demonstrated that they had a contract with Exclusive Fresh and that defendants interfered with this contract, see Bruno Decl. at ¶¶ 2, 7, they have not presented evidence of damages flowing from the loss of the contract. With regard to damages, plaintiffs' evidence is limited to damages suffered as a result of lost crab pots and gear. See Sheer Decl., Exh. Y. These damages do not relate directly to the breach of plaintiffs' contract with Exclusive Fresh. Plaintiffs have failed to demonstrate a genuine issue of material fact as to this claim because they have not presented sufficient evidence of resulting damages. Therefore, the court grants defendants' motion for summary judgment on plaintiffs' claim for intentional interference with contractual relations.

UNITED STATES DISTRICT COURT
For the Northern District of California

2. Intentional Interference with Prospective Economic Advantage

Plaintiffs claim that defendants intentionally interfered with plaintiffs prospective sales of crab in the San Francisco Bay Area. Intentional interference with prospective economic advantage requires (1) an existing economic relationship or one containing the probability of future economic benefit; defendants' knowledge of the relationship; (2) acts designed to disrupt the relationship; (3) actual disruption of the relationship; and (4) damages proximately caused by the defendants. Accuimage Diagnostics Corp. v. Terarecon, Inc.. 260 F. Supp. 2d 941, 956 (N.D. Cal. 2003) (Patel, J.) (citing Della Penna v. Toyota Motor Sales, U.S.A., 11 Cal. 4th 376, 380 n.1, 391-92 (1995)). A plaintiff must demonstrate that defendants' conduct was wrongful by some legal measure; it is not sufficient to prove merely interference itself. Della Penna, 11 Cal. 4th at 393. A plaintiff may prove that a defendants' conduct was independently wrongful by presenting evidence that defendants' actions fell outside of the realm of legitimate business transactions. Gemini Aluminum Corp. v. California Custom Shapes, Inc., 95 Cal. App. 4th 1249, 1258 (Cal. Ct. App. 2002). In this case, plaintiffs have presented sufficient evidence upon which a reasonable factfinder could conclude that defendants engaged in wrongful acts by participating in coercive tie-ups; threatening prospective customers, fishermen and others; and utilizing allegedly violent tactics to pressure competitors to abide by prices set by the associations. Furthermore, defendants intentionally interfered with plaintiffs' contract with Exclusive Fresh. However, while plaintiffs have produced evidence that they suffered damages as a result of the cutting of their crab pot lines, they have presented no evidence of damage to prospective economic relationships. Plaintiffs have failed to demonstrate a genuine issue of material fact as to this claim. Thus, the court grants defendants' motion for summary judgment with respect to plaintiffs' claim for intentional interference with prospective economic advantage.

3. Conversion & Trespass to Chattels

Defendants argue that they are not liable for conversion or trespass to chattels because plaintiffs have not demonstrated that any of the associations or individual defendants were responsible for cutting plaintiffs' crab pot lines. In order to succeed on a claim of conversion, a plaintiff must demonstrate that defendants actually interfered with plaintiffs' dominion or control over her property. 5 Bernard E. Witkin, Summary of California Law § 610 (9th ed. 1990). Trespass to chattels, although rarely applied in California, requires a plaintiff to show that defendants' intentional interference with personal property

proximately caused injury. Id. at § 627(A). In this case, plaintiffs have presented evidence that Whaley cut plaintiffs crab pot lines. Whaley Dep. at 50-51; Cannia Dep. at 38, 39; Sheer Decl., Exh. Z. Plaintiffs suffered financial losses as a result of losing their crab gear. Sheer Decl., Exh. Y. Based on this evidence, a reasonable factfinder could conclude that Whaley is liable for either conversion or trespass to chattels. Plaintiffs have not demonstrated that any other defendant involved in this suit proximately caused plaintiffs injuries stemming from the cutting of plaintiffs' crab pot lines. Thus, the court denies defendants' motion for summary judgment with respect to Whaley and grants defendants' motion with respect to all other defendants.

## II. HMBFMA's Counterclaims

HMBFMA alleges that counterdefendants engaged in unlawful or unfair business practices pursuant to the California Unfair Competition Act ("UCA"), Cal. Bus. & Prof. Code § 17200 et seq., by (1) engaging in predatory pricing in violation of section 17043 of the California Business and Professions Code; and (2) procuring a permit for a fishing vessel equipped with a trawling net in violation of section 8280.1 of the California Fish and Game Code.[20]

### A. Predatory Pricing

To succeed on a claim of predatory pricing under section 17043 of the California Business and Profession Code, a plaintiff must prove both that the seller (1) sold its product below cost, and (2) had the purpose of injuring competitors or destroying competition. Cal. Bus. & Prof. Code § 17043. To meet the cost requirement, the vendor must have sold below his or her own fully allocated or fully distributed cost. Turnbull & Turnbull v. ARA Transp., Inc., 219 Cal. App. 3d 811, 819–20 (1990). Cost includes the cost of raw materials, labor and all overhead expenses. Cal. Bus. & Prof. Code § 17026. Overhead expenses include labor, rent, interest on borrowed capital, depreciation, selling cost, maintenance of equipment, deliver costs, credit losses, all types of licenses, taxes, insurance and advertising. Cal. Bus. & Prof. Code § 17029. California's fully allocated cost standard includes both fixed and variable costs attributable on an average basis to each unit of output. Pan Asia Venture Capital Corp. v. Hearst Corp., 74 Cal. App. 4th 424, 432 (Cal. Ct. App. 1999). Stated simply, cost includes "the initial expense of producing the article together with its share of the load of carrying on the business through which it is sold." Id. Determination

of cost is an issue of fact. Id. To meet the purpose requirement, the vendor "must act with the purpose, i.e., the desire, of injuring competitors or destroying competition." Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 175 (1999). Where the plaintiff proves both below cost sales and injurious effect, the court may infer an intent to injure competitors or destroy competition. Cal. Bus. & Prof. Code § 17071. Whether the sale was "conducted with the purpose of injuring competitors" and "had the tendency or capacity to injure the plaintiff" are usually questions of fact. Fishermen's Wharf Bay Cruise Corp. v. Superior Court, 114 Cal. App. 4th 309, 327 (Cal. Ct. App. 2003).

While HMBFMA has presented evidence that counterdefendants sold crab below cost, they have not raised a genuine issue of material fact as to whether counterdefendants intended to injure competitors or destroy competition. Counterdefendants claim that for the years 1999 to 2001, the Caitlin Ann sold crab for a profit, earning $108,166.68 in 1999, $45,820.55 in 2000, and $20,845.53 in 2001. In response, HMBFMA has presented evidence that counterdefendants did not include all fixed costs in their expenses related to fishing for crab because Dooley believed the primary business to be pollock fishing in Alaska, and only intended to operate the vessel in the crab fishery to earn a profit above variable costs. Dooley Decl. ¶ 6. HMBFMA has presented evidence that counterdefendants operated at a loss, based on their fully-allocated cost, for the years 1999 to 2001. Greene Decl. ¶ 3, Exh. C. HMBFMA's evidence suggests that counterdefendants' variable and allocated fixed costs exceeded revenues by $16,670 in 1999, $50,223 in 2000 and $81,371 in 2001. Id. HMBFMA's estimation of costs appears to be reasonable.

Even if HMBFMA's figures are correct, however, a reasonable juror could not determine that counterdefendants engaged in predatory pricing because HMBFMA has not presented sufficient evidence to show that counterdefendants intended to injure competitors or destroy competition. While intent may be presumed from below cost sales and evidence of an injurious effect on competition, HMBFMA has presented no evidence that counterdefendants were capable of injuring competition. See Cal. Bus. & Prof. Code § 17071. HMBFMA claims that counterdefendants injured competition by depleting the ocean of available crab. While they have put forward evidence that counterdefendants sold approximately 150,000 pounds of crab over the course of a three-year period (1999 to 2001), Greene Decl., Exh. B, they have

UNITED STATES DISTRICT COURT
For the Northern District of California

not shown that this amount of crab constitutes a substantial amount of market share. In fact, counterdefendants have demonstrated that they had only a negligible market share within the San Francisco crab market and that they only fished for crab during the beginning of the season. Dooley Decl. at ¶¶ 4, 7. Even if the court were to assume that counterdefendants sold all of the crab caught between 1999 and 2001 below cost, HMBFMA has failed to show how this would negatively impact competition. Caitlin Ann is only one boat out of three hundred, and there are, of course, other crabs in the sea. Because HMBFMA has not demonstrated that counterdefendants were capable of injuring competitors or destroying competition they have not raised a genuine issue of material fact in regard to their predatory pricing claim.[21]

B. Violation of Permit Requirements

A business practice violates the UCA if it violates another provision of California law.[22] Stop Youth Addiction, Inc. v. Lucky Stores, Inc., 17 Cal. 4th 553, 560 (1998). HMBFMA alleges that counterdefendants engaged in unlawful business practices when they violated section 8280.1 of the California Fish and Game Code by procuring and renewing a permit for Dungeness crab with a vessel that was equipped with a trawling net.[23] HMBFMA also alleges that counterdefendants transferred the permit from Dooley to Caitlin Ann LLC in violation of section 8280.1. A Dungeness crab permit may be issued to someone with a commercial fishing license that has not been suspended or revoked who is, "at the time of application, the owner of a fishing vessel that is not equipped for trawling with a net." Cal. Fish & Game Code § 8280.1(b)(3). A fisherman may have only one Dungeness crab permit, and that permit is nontransferable. Id.

HMBFMA has not produced sufficient evidence to create a genuine issue of material fact with regard to whether counterdefendants violated section 8280.1. In its previous order, the court ordered HMBFMA to submit declarations explaining the reasonable basis for its unlawful business practices allegations. HMBFMA's has produced a declaration by Duncan Maclean, in which he states that he observed the Caitlin Ann was equipped with a trawl net. Maclean Decl. at ¶ 5. Neither the United States Coast Guard documents attached to Maclean's declaration nor the California Fish and Game Records submitted by Dooley support HMBFMA's claim that counterdefendants violated the statute. Maclean

Decl., Exh. 7; Dooley Decl., Exh. 1. HMBFMA has presented no other evidence that the vessel was equipped with a trawl net at the time Dooley applied for the permit for the Caitlin Ann.[24] Therefore, HMBFMA has not demonstrated a genuine issue of material fact in regard to whether Dooley procured or renewed a permit in violation of section 8280.1.

Furthermore, HMBFMA has not demonstrated a genuine issue of material fact as to whether Dooley unlawfully transferred the permit. They allege that the permit was originally issued to Dooley and that the permit must have been illegally transferred to the Caitlin Ann LLC, based on the statement in plaintiffs' complaint that "Caitlin Ann is the registered owner of the fishing vessel F/V CAITLIN ANN." Dooley is the managing member of the Caitlin Ann LLC. HMBFMA has not presented any evidence that Dooley and Caitlin Ann LLC are separate entities for purposes of the permit. Even if HMBFMA had presented such evidence, such a distinction would not alter the fact that the Dooley had a valid permit to fish for Dungeness Crab with the Caitlin Ann for the years 1999, 2000 and 2001. HMBFMA has not presented sufficient evidence to demonstrate that counterdefendants violated section 8280.1 of the California Fish and Game Code. Therefore, HMBFMA has not raised a genuine issue of material fact as to whether counterdefendants violated section 17200 of the California Business and Professions Code.[25]

CONCLUSION

Defendants' motions for summary judgment are GRANTED in part and DENIED in part. Counterdefendants' motion for summary judgment is GRANTED. In particular, the court holds as follows:

1. Defendants' motions for summary judgment with respect to plaintiffs' claim that defendants violated section 1962(c) of Title 18 of the United State Code are GRANTED with respect to Todd Whaley, Jim Salter, Robert N. Miller, Michael McHenry, David Bettencourt, Larry Collins, William Wise, and George Boos. The motions are DENIED with respect to CBOA, FMABB, HMBFMA, John Morgan, Morgan Fish Company, Inc., Michael McHenry, and John T. Tarantino.

2. Defendants' motions for summary judgment with respect to plaintiffs' claim that defendants violated section 1962(d) of Title 18 of the United State Code are GRANTED with respect to Robert N. Miller, Larry Collins, William Wise, and George Boos. The motions are DENIED with respect to all other defendants.

3. Defendants' motions for summary judgment with respect to plaintiffs' Sherman Act claims are DENIED with respect to all defendants.

4. Defendants' motions for summary judgment on plaintiffs' California Business and Professions Code sections 17043 and 17200 claims and on plaintiffs' claims for intentional interference with contract and prospective economic advantage are GRANTED with respect to all defendants.

5. Defendants' motions for summary judgment on plaintiffs' conversion and trespass to chattels claims are DENIED with respect to Todd Whaley and GRANTED with respect to all other defendants.

6. Counterdefendants' motion for summary judgment is GRANTED with respect to all of HMBFMA's counterclaims.

IT IS SO ORDERED.

Dated: April 26, 2004

/s/_______________________
MARILYN HALL PATEL
Chief Judge
United States District Court
Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

**ENDNOTES**

1. Unless otherwise noted, this fact recitation is culled from the parties' moving papers.

2. Fishermen typically enter into market orders with local purchasers prior to leaving port. Before entering into a market order, the associations typically require the purchaser to sign an "Assessment Agreement." This Agreement includes a clause which provides that the purchaser agrees to remit a tax, in addition to the minimum price per pound, to the Association on a regular basis. The tax required for Dungeness Crab is three-cents per pound, and is required regardless of whether the fisherman selling the crab is a member of the association. The associations will not enter into a market order with the purchaser if it refuses to sign the Assessment Agreement.

3. If fishermen are unable to reach an agreed upon price for crab at the start of the season, they will keep their boats tied up at the dock, resulting in a "tie-up" or "strike." Plaintiffs argue that tie ups typically occur during the first two weeks of the season, from November 15th to December 1st, in order to obtain a higher price for crab and to keep Northern District fishermen from fishing. The Northern District consists of District 6, 7, 8, and 9 and runs from Point Arena to the California/Oregon border. District 10 is immediately south of the Northern District and includes the bays at issue in this case. The Northern District season typically opens on December 1st, while the District 10 season opens as early as November 15th.

4. The parties use the word "blackball" to refer to a situation where members of the associations and other fishermen would refuse to sell their crab catch to specific individuals.

5. Plaintiffs erroneously spelled his name "Wailey" in their complaint.

6. Plaintiffs later recovered a small portion of their gear. They made an effort to fish with the crab pots that remained, but were unable to reach their anticipated income for the crab season.

7. The log book for the San Mateo Harbor District at Pillar Point, dated November 17, 2001, states, "Fisherman approached the office asking to use the end of pier to block Dooly [sic] from offloading." The log further states on November 18, 2001, "Duncan asked to tie FV Barbara Faye to load crab gear—gave permission—but now think he just wants to make it difficult for FV Caitlin Ann to tie there."

8. Similar events occurred with respect to Richard Axelson, a fisherman who had agreed to fish for Bodega Bay Fish Company during the 2001 tie-up. The company refused to purchase Axelson's crab after being threatened by members of the FMABB. Axelson had seventy of his crab pots cut. Later in the season, J&S purchased approximately 6,000 lbs. of crab from Axelson, which he placed into a tank. That night someone disabled J&S' circulating seawater system causing the crab in the tank to die. Shach also found a note on his truck stating: "It's not over."

9. Throughout their papers, John Morgan and the Morgan Fish Company, Inc. refer to themselves as the "Morgan defendants." They have not indicated that Morgan Fish Company, Inc. should be treated as

UNITED STATES DISTRICT COURT
For the Northern District of California

anything other than the alter ego of John Morgan. Thus, for purposes of this motion, the court treats John Morgan and the Morgan Fish Company, Inc. as a single defendant.

10. Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). "Person" is defined broadly under the statute to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

11. Members of the associations sell crab at a fixed price through market orders issued by the associations. The market order states the agreed-upon or "ex-vessel" price set by the associations.

12. In full, the Hobbs Act provision at issue states:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a).

13. Plaintiffs also argue that other predicate acts support their claim. Plaintiffs allege that defendants boycotted Three Captains because Three Captains purchased crab from Dooley; that defendants cut crab pot lines belonging to Axelson; that defendants sabotaged the catch purchased by J&S; that defendants coordinated strikes designed to keep boats from the North out of District 10; that defendants refused to terminate a strike even though buyers offered a price acceptable to the fishermen; that defendants slashed a fisherman's tires in retaliation for fishing during a strike; that defendants vandalized Schach's vehicle; and that defendants threatened to blow-up Schach's car if he purchased "scab crab." Plaintiffs do not allege that any particular defendants committed these acts. They merely state that "defendants" engaged in such acts. These aallegations are insufficient to constitute predicate acts for purposes of RICO because plaintiffs have not produced any evidence showing that these defendants or which defendants committed these acts.

14. While plaintiffs have presented evidence that Jim Salter, Michael McHenry, and Todd Whaley committed a single predicate act, in order to be liable under section 1962(c), each of these defendants must have committed at least two predicate acts within ten years. <u>See</u> 18 U.S.C. § 1961(5).

15. Section 4 of the Clayton Act provides a private right of action for violations of section 2 and allows the plaintiff, in such an action, to recover treble damages. 15 U.S.C. § 15.

16. A market share of less than 50% in an actual monopolization case, and a market share of less than 30% in an attempted monopolization case, will generally be deemed insufficient. Rebel Oil, 51 F.3d at 1438.

17. Because the court concludes that a reasonable factfinder could find that defendants' acts were per se illegal, the court need not engage in a "rule of reason" analysis. See Local 36 of Int'l Fishermen & Allied Workers of America, 177 F.2d at 331. The court notes in addition that plaintiffs have demonstrated a genuine issue of material fact under the rule of reason analysis, because a jury could conclude that defendants' anticompetitive conduct restrained competition within the relevant market. See Thurman Indus., 875 F.2d at 1373; Morgan, Strand, Wheeler & Biggs, 924 F.2d at 1489.

18. Other cases have also held that associations of fishermen that combined to fix the price of fish violated section 1 of the Sherman Act. See e.g., Hinton v. Columbia River Packers Ass'n, Inc., 131 F.3d 88, 89 (9th Cir. 1942) (holding that a union of fishermen violated section 1 by combining to fix the price of fish and control the sale of fish because such actions deprived consumers of "the advantages which accrue to them from free competition in the market"); Manaka v. Monterey Sardine Ind., Inc., 41 F. Supp. 531, 534 (N.D. Cal. 1941) (Fee, J.) (holding that an association of sardine fishermen could be held liable under the antitrust laws for fixing the price at which sardines were to be sold and excluding non-local competitors from the market).

19. Defendants claim that they are not liable under section 1 of the Sherman Act because the activity of the associations should be considered the activity of a single firm under the Fisherman's Collective Marketing Act ("FCMA"), 15 U.S.C. §§ 521-22. Defendants cite Maryland and Virginia Producers Assoc., Inc. v. United States, 362 U.S. 458 (1960), for the proposition that they should not be liable under that Act. While that Act does give individual fishermen joining in a cooperative or association the same rights as other business entities, it does not provide them with immunity for antitrust violations. Maryland and Virginia Producers Assoc., 362 U.S. at 466-67 ("In the event that associations authorized by this bill shall do anything forbidden by the Sherman Antitrust Act, they will be subject to the penalties imposed by that law."). Nor does it allow them to join collectively so as to use a monopoly position to suppress competition. Id. at 472 ("We hold that the privilege the Capper-Volstead Act grants producers to conduct their affairs collectively does not include a privilege to combine with competitors so as to use a monopoly position as a lever further to suppress competition by and among independent producers and processors."); see also Hinton v. Columbia River Packers Ass'n, Inc., 131 F.2d 88, 89 (9th Cir. 1942) (holding that fishermen acting together as a union to fix prices were not exempt from section 1 of the Sherman Act by virtue the FCMA).

20. In defendants' opposition papers, HMBFMA states that it no longer intends to pursue its claim that Dooley fished in a wantonly wasteful and destructive manner in 1999 or that he threatened to harm and

actually did harm defendants' fishing gear by trawling of the coast off Central California.

21. In their moving papers, counterdefendants argued that any below cost sales were made in a good faith effort to meet the price of competitors. See Cal. Bus. & Prof. Code § 17050(d). The Court need not address this defense in light of the conclusion that HMBFMA has failed to demonstrate a genuine issue of material fact with regard to its predatory pricing claim.

22. Section 17200 also prohibits unfair business practices. Cal. Bus. & Prof. Code § 17200. HMBFMA has not demonstrated that counterdefendants' conduct was unfair within the meaning of the statute because they have not presented any evidence that counterdefendants' alleged procuring of a permit or transferring of that permit threatened an incipient violation of the antitrust laws or violated the policy or spirit of the law in a way that is comparable to a violation of the law or otherwise significantly threatened or harmed competition. See Cel-Tech Communications, Inc., 20 Cal. 4th at 187.

23. It is undisputed that the Caitlin Ann had a Dungeness crab permit, issued by the Department of Fish and Game, for 1999, 2000 and 2001. Dooley Decl., Exh. 1.

24. As this court noted in its prior order:

> To the extent HMBFMA alleges that counterdefendants' crab fishing without a valid permit was an unlawful business practice, this is not a separate cognizable claim. Section 8280.1 does not prohibit fishing for crab with a vessel that has a trawl net. The unlawful business practice at issue is procuring a permit for a vessel that at the time has a trawl net, in violation of section 8280.1.

25. Defendants have also failed to present any evidence of damages resulting from plaintiffs' alleged violation of section 17200 that would be compensable under the UCA.

UNITED STATES DISTRICT COURT
For the Northern District of California